**SATELLITE RECEIVERS, LTD., Plaintiff,**

v.

**HOUSEHOLD BANK (NEVADA) N.A., Defendant.**

**No. 98–C–114.**

United States District Court, E.D. Wisconsin.

June 4, 1999

---

1. The Court's award of attorney's fees, court costs and expenses was made during the hearing held on May 19, 1999.

Craig A. Kubiak, Liebmann, Conway, Olejniczak & Jerry, Green Bay, WI, for plaintiff.

Joseph A. Ranney, Daniel W. Hildebrand, DeWitt, Ross & Stevens, Madison, WI, for defendant.

### OPINION AND ORDER

CURRAN, District Judge.

Satellite Receivers, Ltd. (SRL) is a Wisconsin corporation with its principal place of business in Green Bay, Wisconsin. SRL is engaged in the business of selling, among other products, satellite dishes, programming and related products, both directly and through its dealers. Household Bank (Nevada) N.A. (Household) is a federally chartered national bank with its principal place of business in Prospect Heights, Illinois. In 1996, Household Bank (Illinois) N.A. assigned its assets to Household, which also assumed all liabilities. Household is the successor in interest to Household Bank (Illinois) N.A. with respect to the assets and liabilities. Household makes private label credit card pro-

gram agreements with merchants such as SRL who distribute products to their dealers for resale to consumers. Jurisdiction in this case is predicated on diversity of citizenship, 28 U.S.C. § 1332(a)(1).

On January 2, 1992, Household and SRL entered into a written agreement pursuant to which Household created a credit card financing program for SRL and its dealers. A dispute arose between the parties, resulting in a lawsuit under the Wisconsin Fair Dealership Act. This lawsuit terminated in a settlement agreement dated May 1, 1997, by the terms of which, in relevant part, Household agreed to pay to SRL four percent of the net billed finance charges after the date of the agreement with respect to sales financed by Household prior to the agreement. The parties further agreed that Household would not be obligated to finance any sales of products and services after the agreement and that certain provisions of the 1992 agreement would remain in effect, including the provisions of Section 7. Section 7 of the 1992 agreement provided as follows:

*Section 7. Chargebacks to Merchant.* Merchant agrees as follows:

(a) *Chargebacks.* Any Sales Slip or Card Sale is subject to Chargeback under any one or more of the following circumstances:

(i) The application or any information on the application or the Sales Slip or any required information on the Sales Slip (such as the account number, expiration date of the Card, description of Dealer or Goods purchased, transaction amount or date) is illegible or incomplete, or the Sales Slip or application is not executed by the Cardholder; or Authorization is not obtained from Household's Authorization Center, or a valid Authorization number is not correctly and legibly entered on the Sales Slip; or the Sales Slip is a duplicate of an item previously paid, or the price of the Goods or services shown on the Sales Slip differs from the amount

shown on the Cardholder's copy of the Sales Slip;

(ii) Household determines that (1) Merchant or the Dealer has breached or failed to satisfy any term, condition, covenant, warranty, or other provision of this Agreement, including, without limitation, *Sections 5 and 6* above, or of the Operating Instructions, in connection with a Sales Slip or the transaction to which it relates, or an application for a Card or the opening of an Account; or (2) the Sales Slip, application/agreement or Card Sale is fraudulent or is subject to any claim of illegality, cancellation, rescission, avoidance or offset for any reason whatsoever, including, without limitation, negligence, fraud, misrepresentation or dishonesty on the part of Merchant or Dealer or their respective agents, employees, licenses, or franchisees, or that the related transaction is not a bona fide transaction in Merchant's or Dealer's ordinary course of business;

(iii) the Cardholder disputes or denies the Card Sale or other Card transaction, the execution of the Sales Slip or application/agreement, or the delivery, quality, or performance of the goods, services or warranties purchased, or the Cardholder has not authorized the Card Sale, or alleges that a credit adjustment was requested and refused or that a credit adjustment was issued by Merchant or Dealer but not posted to Cardholder's Account; or

(iv) Merchant fails to deliver to Household the Sales Slip, Credit Slip, application or other records of the Card transaction within the times required in this Agreement.

(b) *Resolution and Payment.* Merchant is required to resolve any dispute or other of the circumstances described above in (a) of this Section to Household's satisfaction within fifteen (15) days of notice of Charge-back of a Sales Slip or Merchant shall pay to Household the full amount of each such Sales Slip subject to Chargeback or the portion thereof designated by Household, as the case may be, plus finance charges thereon, and other fees and charges provided for in the Cardholder agreement. Upon charge-back of all or a portion of a Sales Slip, Merchant and Dealer shall bear all liability and risk of loss associated with such Sales Slip or Account, or the applicable portion thereof, without warranty by, or recourse or liability to, Household. Household may deduct amounts owed to Household under this Section from any amounts owed to Merchant under this Agreement. If Merchant and a Cardholder resolve a billing inquiry or dispute on a Card Sale which has been charged back, and Household is permitted by law, to rebill the Cardholder for all or a portion of the disputed amount, Household will repay Merchant for that portion of the chargeback which Household can rebill the Cardholder, provided that Merchant requests such repayment within ninety (90) days from the date of the Chargeback. However, if due to federal and/or state laws, Household is not able to rebill a Cardholder for all or a portion of a disputed transaction, Household will not be required to repay Merchant for the Chargeback.

In addition to Household's rights to Chargeback, Merchant shall pay Household the Application Chargeback Fee for each Sales Slip subject to Chargeback because of any violation or breach of any term, condition, covenant, warranty or other provision concerning an application/agreement or the opening of an Account, including, without limitation, each provision of *Section 5(f)* above.

(c) *Excessive Chargebacks.* If the aggregate number of Sales Slips subject to ·Chargeback exceeds 1.5% of

the total number of Card Sales submitted by Merchant with respect to an individual location or Dealer in any calendar quarter (*"Excessive Chargebacks"*), Household reserves the right to assess, and Merchant agrees to pay the Excessive Chargeback Fee, in the amount identified above, for each Sales Slip that is subject to Chargeback in excess of the 1.5% limit. In addition, Excessive Chargebacks shall be deemed a material breach of this Agreement and Household has the right, in its sole discretion, to terminate this Agreement pursuant to *Section 16(c)*.

(d) The terms and provisions of this *Section 7* shall survive the termination of this Agreement.

Among the products offered to SRL customers were the "Alpha Star" products consisting of satellite dishes and programming services. The Alpha Star products, which might or might not include up to a year of free Alpha Star programing, typically cost between $2,000 and $3,000. In May 1997, Alpha Star and its parent Tee-Comm filed for bankruptcy. Shortly after filing, Alpha Star stopped broadcasting its programing and both entities are now completely out of business. The Alpha Star satellite dishes could only receive Alpha Star programing and could not be modified to receive programing from other satellite television providers. Not surprisingly, many of the people who had bought Alpha Star satellite dishes disputed their accounts and/or discontinued making payments. Household placed all of these Alpha Star accounts into "dispute status" which had the affect of suspending the customer's obligation to make further payments on the accounts until the disputes were resolved.

Representatives from Household and SRL discussed the Alpha Star situation and SRL proposed that it offer the Alpha Star customers a substitute satellite dish which was configured to receive DirecTV satellite programing. If the customers agreed to pay for the installation and DirecTV programing, they would receive the dish for free and would remain obligated on the original Alpha Star package purchase.

By letter dated August 29, 1997, David Charles, the President of SRL, sent a letter to Household setting forth a proposal by which Household would agree to not charge back to SRL any of the Alpha Star accounts, to provide communication and support for the DirecTV transition, and to pay half of the "soft costs" connected with the transition up to the amount the customer had prepaid. Household rejected the offer by letter dated October 13, 1997, stating that disputes arising from the Alpha Star situation were subject to the chargeback provision of the 1992 agreement and would be handled accordingly.

Household maintains that the dishes which SRL proposed to substitute for the Alpha Star dishes typically cost between $200 and $500, whereas the Alpha Star packages typically cost between $2,000 and $3,000. SRL disputes this, claiming that the dishes which were part of the DirecTV package cost between $1,500 to $2,000. Household claims that it did not charge-back the accounts of customers that accepted the DirecTV offer but SRL claims that 28 accounts were chargedback and that these accounts represented customers who did in fact accept the DirectTV offer. There is no indication in the file, however, as to when these 28 customers accepted the DirecTV offer, whether SRL informed Household that the 28 had accepted the offer, and whether the acceptances were in full resolution of the dispute. The record is also silent as to whether these 28 individuals continued to pay SRL when there accounts were charged back.

SRL disputes three other chargebacks—the accounts of Marie Ruhf, Richard Peterson, and David Garrison. Household was notified by Ruhf on March 21, 1997, that the equipment was not working properly, that the installer had returned several times to try to remedy the situation but

that it still was not operating properly and that he wanted the system removed from his property and the account closed. The account was placed in dispute status and ultimately charged back to SRL. By letter dated June 25, 1997, SRL informed Household that on March 25, 1997, all known problems were resolved and that it was the belief of SRL that the consumer problem had "more to do with buyer remorse, then [sic] any real problem with the satellite system...."

The Peterson account was placed in dispute status when the system failed to work because trees on the property were interfering with the reception. Apparently two trees had been trimmed but two other trees were still interfering and the customer refused to have them trimmed due to his belief that the trees would die if they were topped.

The Garrisons complained, through an attorney, that their satellite equipment was not operating properly. They demanded that the equipment be removed from their property. They apparently refused to permit SRL representatives to attempt to rectify the problem and SRL was unable to rectify the situation.

SRL commenced this action seeking a declaration that the chargebacks attempted by the Defendant were improper. Household counterclaimed for the amount of the chargebacks, less any participation fees that it has withheld as an offset.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(c). Rule 56(c) requires the entry of summary judgment after adequate time for discovery against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear

the burden of proof at trial." *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the standard for granting judgment as a matter of law under Rule 50(a), which requires that the court grant such a verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322 (7th Cir.1992) quoting *Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Substantive law determines which facts are material, that is, which facts might affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* To establish a genuine issue of fact the nonmoving party "must do more than simply show that there some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. The nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

## DISCUSSION

The governing issue in this case is which party to the 1992 contract agreed to accept the risk of faulty equipment. Section 7(a)(3)(i) provides that the merchant agrees that a card sale is subject to chargeback when the cardholder disputes the "quality, or performance of the goods, services, or warranties purchased...."

SRL customers who purchased the Alpha Star system were left with a worthless piece of metal and wires when Alpha Star declared bankruptcy and discontinued programing. Although SRL may have been totally blameless as to the transaction between it or its dealers and the customer, it is quite clear that under Section 7(a)(3) it agreed to assume the risk of such an eventuality. Section 7(b) gives SRL 15 days after the date of the notice of the chargeback to resolve the dispute. Even after the chargeback has been imposed, if SRL and the customer resolve their dispute, Household agreed to repay SRL for any portion of the account which it can rebill the customer provided that SRL requests the repayment within 90 days from the date of the chargeback.

■ SRL makes a number of arguments regarding the Alpha Star's chargebacks, none of which have merit. It argues that Section 7 only applies to situations in which SRL's performance was somehow deficient and that the Alpha Star customers were not disputing SRL's performance with respect to the satellite dishes but rather the performance (or in this case, nonperformance) of the programing supplied by Alpha Star. This fine hair splitting, however, ignores the fact that the Alpha Star dish could only receive Alpha Star programing and, without the programing, the dish was useless. The customers refused to continue paying on their account and, under the plain language of Section 7, Household was permitted to make the chargeback to SRL. There is nothing in the language of Section 7 that limits Household's right to chargeback accounts to situations involving SRL's performance when the complaint involves the quality of the goods. The dispute in these situations becomes one between SRL and the customer rather than Household and the cardholder.

■ SRL's reliance on the doctrine of impossibility is misplaced because SRL agreed to accept the risk when the dispute involved the quality or the performance of the goods. Impracticability of performance does not discharge a party's duty of performance when the risk of the occurrence is assumed by the contracting party. *See* Restatement (2d) of Contracts, Section 261 et seq. (1981). "[M]utuality of obligation in a bilateral contract does not mean the liabilities of both parties or the benefits accruing must be equal." *Levin v. Perkins*, 12 Wis.2d 398, 403, 107 N.W.2d 492, 495 (1961).

With respect to the 28 customers which SRL maintains accepted the DirecTV offer, SRL has failed to offer any evidence that it complied with its contractual obligation to notify Household that the dispute had been resolved and that Household could rebill the cardholder for the remainder of the obligation. Under the terms of the contract Household was not obligated to participate in the DirecTV offer and to assume any financial obligations with respect to the offer. The court accordingly finds that summary judgment is appropriate with respect to the Alpha Star dispute.

The court does find, however, that issues of fact exist with respect to the Ruhf, Peterson, and Garrison accounts. It appears that SRL may have resolved the Ruhf account and notified Household in a timely fashion. It further appears that the Peterson and Garrison complaints may have been a pretext for buyer remorse. It would seem that Household's obligation of good faith would compel it to withdraw a chargeback once it appears that the customer's complaints were merely a pretext for a desire to avoid his or her obligations. Accordingly,

IT IS ORDERED that the motion of Household Bank for summary judgment IS GRANTED with respect to the Alpha Star chargebacks and DENIED with respect to the claims on the Ruhf, Peterson, and Garrison chargebacks. The amount of the judgment will be determined at the time final judgment is entered.